## GENEVIEVE DOWSETT vs. WILDER'S STEAMSHIP COMPANY.

### September 26, 1904.

*Dangerous Boat Landing.—Special Care:* A boat landing is dangerous to the extent of requiring special care when the condition of the sea is such that it is necessary to watch for a favorable opportunity for a boat to leave the slip.

*Negligence:* Under such conditions it was negligence not to send a responsible officer of the vessel with the boat, unless the boat steerer was competent.

*Same:* To so load the boat with bulky freight that only two out of the boat's four oars could be used upon leaving the slip, and to delay in getting the second oar into operation for from 47 to 71 seconds.

Whether taking the boat out stern first under the circumstances was negligence, *quaere.*

*Vis Major.—Act of God.—Peril of the Sea:* Reducible to the term *inevitable* or *unpreventable accident.*

*Common Carrier.—Burden of Proof:* The burden of proof, on failure to deliver the goods in good order, is on the carrier to show loss resulted from inevitable accident or other cause for which he was not responsible.

*Damages.—Limitation of:* Printed notices placed on walls of state-room and office for sale of tickets to the effect that carrier will not be-liable for injury or loss of baggage for over $100 are not a part of the contract for carrying the passenger, and do not bind him unless he has read them or his attention has been called to them by the carrier.

In Admiralty:    Libel in *Personam* for Damages for Injury to Trunk of Clothes.

J. J. Dunne, Proctor for Libellant.

Kinney, McClanahan & Cooper, Proctors for Libellee.

DOLE, J.    The libellant claims damages for injury to a trunk of clothes occurring at the landing of Makena, Island of Maui, while in one of libellee's boats on its way from the shore to the ship. The libellee, admitting the injury, defends on the ground that such injury was caused by a *vis major* or act of God, in that, as the boat left the shore it was caught unexpectedly by a blind roller and swamped under circumstances in which it could not have been prevented by any care or precautions on its part; and also, that if it is liable for damages, it is only liable for one hundred dollars, as it had notices to the passengers in large type displayed on the walls of its office in Honolulu where tickets are sold, and also on the walls of the state-rooms on the said steamer "Kinau," to the effect that the ship would not be liable for damages to baggage for any amount over one hundred dollars.

The main issue in this case is the question whether the damage to the baggage was caused by inevitable accident or whether it happened through the negligence of libellee's servants. The following facts are undisputed: That the libellant came to the landing of Makena to embark on the steamer "Kinau," belong-ing to the libellee, early in the morning of the 19th of December, 1903, the time being about two o'clock; that she brought with her a large trunk containing clothes; that she went out to the steamer in the first boat that came ashore, leaving her trunk on the wharf and that the second boat with its crew re-

ceived this trunk aboard with other freight and started for the ship; that on leaving the slip or the wharf, this boat was struck by a wave which partially or wholly filled it which was followed by two other large waves whereby it was completely swamped, the freight washed out of her and she driven ashore and wrecked.

The issue of fact relates to the arrangement of the freight on this boat as affecting the handling of the necessary oars; also the actual management of the boat on leaving the slip and the nature of the landing as to danger.   The boat slip at this place is a regular inlet in the shore with parallel sides, with a wharf on the left side of it, going in, which left side is also the *makai* side towards the anchorage. · This slip lies substantially at right angles to the shore and in taking the boat from the slip to the steamer it is necessary on leaving the slip to turn to the right in order to point for the ship.   There is considerable dispute in this case as to whether this landing was a dangerous one or not.   The answer recognizes the fact that it is one of the dangerous landing places visited by the said steamer "Kinau" and is very fully exposed to the dangers of the sea and recites that the shore boats used are strong and staunch and calculated, save under exceptional conditions, to carry both freight and passengers safely, and that when exceptional conditions prevail landings are not made at that port.   The answer also recites that the night referred to "was dark and the sea rough, but "apparently not more so than at other times when landings had "been safely made, and that if landings were not made under "such conditions, they could seldom be made in winter."

The brief of counsel for libellee, on the other hand, contends that the evidence shows "that Makena might well be regarded as "one of the safe ports touched at by libellee's boats," it having been shown by Captain Lorenzen's testimony, that no accident had happened there since 1886; also that the sea on that night "was apparently smooth."

I incline to the statement of the answer, that this landing is

a dangerous one, in spite of Captain Lorenzen's testimony that it is a safe one; he admits that he had a boat driven ashore there at one time. The answer alleges its dangerous character circumstantially, and the custom testified to by several of the witnesses in this case, of having some one go to the end of the wharf on occasions when the sea was rougher than usual and look out to sea and signal to the boat the best time for making a start, is a significant circumstance supporting the theory of a dangerous landing. I am also impressed by the evidence in this case to the effect that the sea, on the night in question, was somewhat dangerous; this is supported by Hono's testimony, who says there were large waves that night and "on an occasion like this it was necessary to watch;" also "the sea was not very good at that time," referring to the time of starting from the slip. This being so, the master of the ship or his servants knew, or should have known, that there was occasion on that evening for special care and caution in the management of the boats. If no responsible officer of the ship came ashore in either boat, that in itself was negligence unless the boat steerers were men who could be trusted under such circumstances.

The evidence in regard to the character of rollers, or waves, which caused the damage is somewhat vague and contradictory. An effort was made by the defense to show that there were two classes of waves coming ashore at that place of an entirely different character; that the ordinary waves were rolling in and then a blind roller, something quite different, would come in. As I understand the matter, waves approaching a shore are substantially the same in character. Ordinary waves on reaching a certain depth of water surge and break, and they break on about the same line, making the familiar belt of breakers. Now and then a larger roller comes in, and because of its size it must break in deeper water than the ordinary waves; when it reaches its depth is suddenly surges at its summit and breaks in a greater or lesser degree according to the character of the bottom. It appears to come suddenly because

the ordinary waves are not breaking at that point, and its appearance is usually unexpected. These men, who were managing the boats, were familiar with that landing and knew that when the sea was rough the landing was dangerous, and they had developed the custom of having some one stand at the outside end of the slip to watch the waves coming in from the sea and call out when there was a good chance to go out. That in itself shows that the place was dangerous and that dangerous waves were liable to appear in such weather and that it was a prudent thing to watch for them. Mr. Wight says that no such watch was required and that it was objectionable because it would divide the authority as regards the management of the boat. Admitting this, it is, I think, proved that the men of their own motion had carried on this practice indefinitely, which may not have been known to the president of the company, Mr. Wight.

It is very clear from the evidence, and mainly of Hono and Kahiona, witnesses for the defense, that this boat was loaded with freight of such a character that the management of the boat and the use of the oars was seriously interfered with. The boat went out of the slip stern first, the rowers changing their positions and sitting with their backs to the steersman, who handled a large steering oar. As the boat left the slip the starboard bow oar, which in the reversed position of the boat would be the sternmost oar on the left side of the boat facing the steersman, was the only one which was in the water. Oar No. 2, which was the first oar on the port side nearest the real bow, could not be put out until the boat cleared the slip, and there was much self contradiction on the part of Kahiona as to this oar, whether it ever got into the water or was used at all before the catastrophe. He said at one time "it could not be used because the crate was too high." This he substantially repeated later. He finally said that oar No. 2 was in the water and being used when the wave struck the boat. The way this last testimony was given did not inspire confidence and, taken with

12—U. S. D.

Hono's testimony, in effect that only one oar was out when the wave struck the boat,—the bow starboard oar; the others "had "a chance to get the oars out but before they were able to take "out the oars the surf or wave caught the boat;" this was the position when the wave caught them. It is doubtful if more than one oar was in operation when the wave struck the boat, it being undisputed that oars Nos. 3 and 4 were not used on account of the crates being in the way. Hono's testimony that he could not turn the boat around with his steering oar may be accounted for by the fact that it had no headway beyond the motion given it by the receding wave. Luuwai says the boat did not go out straight and got into the wrong position on one side of the channel, where the roller struck them on the side.

Although the loading of the boat was very bulky, it does not appear that it was very heavy. Captain Freeman says the boats of the steamer "Kinau" carry over three tons in good weather and will float with four and a half tons; in rough weather they will carry two tons. The weight on this occasion is not very accurately estimated. Some evidence was given as to the weight of some of the articles. With this partial evidence and calculating the weight of the three extra men in the boat, the aggregate weight of the freight and passengers would appear to be a little over two tons. These two witnesses, Kahiona and Hono, gave their views as to the length of time which elapsed between leaving the slip and being struck by the wave, by clapping their hands to show when the boat left the slip and clapping them again to show when the wave struck the boat,—Hono' making the period seventy-one seconds and Kahiona forty-seven seconds. Hono says the distance was a boat and a half's length, which would make about thirty-six feet. Certainly the space of about a minute was a very adequate time to have gotten steering headway on to this boat if it had been properly manned and even if these two oars had been made ready to use in leaving the slip it seems probable that a good headway should have been attained in that time; though this is uncertain.

As far as can be discerned from the testimony, the boat proceeded out on the receding wave from the slip and remained broadside to the waves, exposed to danger in its most defenseless part. The tendency of a blind roller striking the side of a boat is to come aboard; if the bow of the boat points to the blind roller the injurious tendency is greatly reduced, so that in many cases, what would be dangerous to a boat lying parallel to a blind roller, would not be in any way dangerous to the same boat lying head on to the roller. There is very little evidence about the size of this roller. Hono says it came on to him from above. Freight was taken on board this boat of such a character and stowed in such a manner that only one-half of the propelling power of the boat could be utilized, and, as shown above, but one oar was in operation before the catastrophe. I believe that if the boat had had the use of all of its oars and they had been used with ordinary skill and she had been promptly turned seaward on leaving the slip, as could have been done with all of the oars or perhaps with two or three of them, she would have escaped the catastrophe which occurred. It is a question whether, under such circumstances, it was not negligence to take the boat out of the slip stern first with a large steering oar in what was then the bow of the boat,—an oar which could easily have been struck aside by such a wave as a blind roller and which in such a sea was likely to be far less effective than if it was in its proper position at the stern.

Although *vis major, act of God* and *peril of the sea,* have distinctive meanings, they are often confused with each other, and generally are reducible to the term *inevitable* or *unpreventable accident,* which is a catastrophe "occurring without the intervention of human agency and producing a loss in spite of all human effort or sagacity." The burden of proof upon failure to deliver the goods in good order and condition, is on the carrier, to show that the loss resulted from an inevitable accident or some other cause for which it is not responsible.

I am not convinced that the accident in this case was an

inevitable one, but am of the opinion that it occurred because of the negligence of the servants of the libellee in loading the boat so that the necessary use of the oars was interfered with, and by their carelessness in managing the boat in the face of a danger that called for more than ordinary care, which negligence and carelessness was a direct and proximate cause of the loss.

The defense of the libellee that if liable at all it is only liable for one hundred dollars, is based on the fact that it had notices limiting its liability for injury or loss of baggage to that amount, posted in large type on the walls of its office in Honolulu where tickets are sold, and also on the walls of the staterooms of the steamer "Kinau." The libellant testified that she had never read these notices.

While "it is undoubtedly competent for carriers of passen-"gers, by specific regulations, distinctly brought to the knowl-"edge of the passenger, which are reasonable in their character "and not inconsistent with any statute or their duties to the "public, to protect themselves against liability, as insurers, for "baggage exceeding a fixed amount in value, except upon addi-"tional compensation, proportioned to the risk," (*Railroad Company v. Fraloff,* 100 U. S. 24, 27), a notice to passengers printed on the back of a ticket to which the attention of the passenger has not been called and which he has not read, is not a part of the contract embodied in the ticket. *The Majestic,* 166 U. S. 375.

It follows from these authorities that notices to passengers on the walls of libellee's office where tickets are sold, and on the walls of the state-room occupied by the libellant, which were not brought to her attention nor read by her, were not part of the contract between her and libellee, and had no effect in modifying the libellee's responsibility in regard to the transportation of her baggage.

The evidence as to the value of libellant's clothing contained in the trunk in question is not disputed. It was given by the

libellant and a professional dress-maker, whose estimates nearly agree. The aggregate value of this clothing before the injury, as stated by the latter, is four hundred and twenty-nine ($429.00) dollars, which is under the amount claimed. The loss was total according to his evidence and that of the libellant.

A decree may be entered in favor of the libellant for that amount and costs.